128 So.2d 62 (1961)
William T. JACK d/b/a Jack Construction Co.
v.
Stephen G. HENRY.
No. 5203.
Court of Appeal of Louisiana, First Circuit.
March 6, 1961.
*63 White & May, Baton Rouge, for appellant.
Taylor, Porter, Brooks, Fuller & Phillips, Frank W. Middleton, Jr., Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, JONES, HERGET and LANDRY, JJ.
LANDRY, Judge.
Plaintiff William T. Jack, d/b/a Jack Construction Co., a building contractor, instituted this action against defendant, Stephen G. Henry, to recover an aggregate of $2,833.65 allegedly due pursuant to the terms of a written contract wherein the former agreed to construct a residence for the latter in consideration of the price and sum of $25,293.39. The amount for which plaintiff seeks judgment herein is composed of the sum of $2,529.33, representing 10% of the contract price withheld by defendant as provided for in the agreement and the additional sum of $304.32, consisting of $44.60 premium on builder's risk insurance and $259.72 premium on the performance bond furnished by plaintiff as called for in the contract; it being plaintiff's contention responsibility for said performance bond and insurance premium is imposed on defendant according to the terms of the contract between the parties involved in this litigation.
To plaintiff's petition defendant filed an answer consisting of a general denial and reconventional demand for judgment against plaintiff in the sum of $2,871.01, representing the cost of repairing certain alleged flaws, defects and imperfections in the dwelling as well as certain expenses chargeable to plaintiff under the contract but paid by defendant.
Plaintiff filed exceptions of no right and no cause of action to defendant's reconventional demand predicating same on the ground defendant accepted the contract despite the presence of patent defects in the work and in so doing released plaintiff of all responsibility therefor. In this connection, plaintiff also contends defendant is estopped to recover the cost of repairing any defects or imperfections because defendant contributed to said defects, stood idly by permitting them to be made and subsequently prohibited plaintiff from entering the premises to effect the necessary repairs and corrections.
After a prolonged trial in the court below (resulting in a record in which 750 pages of testimony were introduced together with innumerable exhibits in the form of letters and pictures) judgment was rendered: (1) overruling plaintiff's exceptions of no right and no cause of action to defendant's reconventional demand; (2) rejecting plaintiff's claim for $304.32, representing premiums paid on builder's risk insurance and contractor's performance bond; (3) in favor of defendant on the reconventional demand in the aggregate sum of $2,210.86; (4) in favor of plaintiff and against defendant in the sum of $318.47 (said amount evidently being the difference between the retained percentage of $2,529.33 sought by plaintiff contractor and the offset allowed defendant in reconvention of $2,210.86). From said judgment plaintiff has taken this appeal.
In his brief, learned counsel for appellant complains of many alleged errors on the part of the trial court, however, in oral argument before this court esteemed counsel specifically abandoned all complaints of error save the following: (1) The failure of the trial court to sustain plaintiff's exceptions *64 of no right and no cause of action to defendant's reconventional demand; (2) The allowance of credit to defendant in the sum of $573.16 for repair of a tile porch, said item not having been contained in the reconventional demand; (3) The award to defendant in the sum of $500 for inconvenience and discomfort; (4) The allowance of credit to defendant in the sum of $570.26 to repair defective plaster; (5) Rejection of plaintiff's claim for builder's risk insurance premium in the sum of $44.60 and performance bond premium in the sum of $259.72; (6) The granting of credit to defendant in the sum of $250.93 to repair the exterior South and East brick walls and (7) Rejection of plaintiff's claim for certain extras allegedly ordered by defendant.
We shall first consider the exceptions of no right and no cause of action filed by plaintiff in opposition to defendant's reconventional demand. As previously stated, the exceptions are founded on the theory that defendant having unconditionally accepted the contract may not recover the costs of repairing patent defects therein and additionally, that defendant is estopped because he contributed to the defects, stood idly by without complaining and ultimately prevented plaintiff from entering the premises to correct the imperfections in question.
The voluminous transcript of evidence in this case reveals that defendant decided to build two homes, one for himself and one for his son, (both of which said residences were to be in approximately the $25,000 class). Plans and specifications for the homes were prepared by John F. Wilson, an architect, and submitted to various contractors for bids. Plaintiff Jack submitted the low bid for the construction of the proposed residences but all bids were rejected by defendant and negotiations then conducted with Jack for the construction of the residence to be built for the occupancy of defendant himself. Pursuant to certain telephone conversations, the price of construction of the single residence was agreed upon and a written contract for the construction thereof entered into between the parties. The contract in question provides that defendant owner specifically reserved the right of supervision and that there would be no supervision of construction by the architect.
At the outset relations between plaintiff and defendant were extremely cordial but obviously deteriorated because defendant, having retained personal supervision, demanded near perfection in the work. During the latter stages of construction (and long before defendant's formal acceptance of the contract) defendant wrote plaintiff numerous letters complaining bitterly of various alleged flaws and defects in the work. The tone of said letters indicated clearly defendant's progressive irritation at the manner in which certain aspects of the construction were being performed. Following defendant's formal acceptance of the contract, plaintiff made several visits to the premises in an attempt to rectify some of the defects about which defendant complained but the feeling between the parties ultimately became so strained that upon an undisclosed date defendant denied plaintiff further access to the premises.
The obligation of a contractor to perform a work or undertaking in the manner agreed is imposed by Article 2769, LSA-R. C.C. which not only sets forth the duty of the undertaker but the liability which ensues upon his non-performance, as follows:
"Art. 2769. If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."
In interpreting the foregoing codal authority the courts of this state have repeatedly and consistently held that notwithstanding the contractor's default, where the owner derives benefit from the work, the contractor is nevertheless entitled to recover the contract price less whatever damages the owner may prove attributable to such default, the remedy of *65 the owner being a reduction in price equal to the cost of completing or repairing the work. Home Service v. Marvin, La.App., 37 So.2d 413; Cairy v. Randolph, 6 La. Ann. 202; Reimann Construction Company v. Upton, La.App., 178 So. 528; Merrill v. Harang, La.App., 198 So. 386; Esposito v. D'Assaro, La.App., 49 So.2d 356; Poche v. Landry, La.App., 57 So.2d 808; Montague v. Milan, La.App., 67 So.2d 351.
Stated otherwise it may be said the rule in this state is that where reciprocal obligations are to be performed under contract, if one party does not complete the work undertaken as agreed upon and the other received the thing contracted for, the latter is bound to pay the value of the thing in the condition in which it is delivered, the builder being authorized to prove the value of the work done in offset of the owner's demand for damages for alleged nonperformance. Dyer v. Seals, 7 La. 131; Clark v. Kemper, 3 Rob. 10.
It is also the established jurisprudence of this state that where the owner of a building or work accepts same without complaint he may not thereafer recover the costs of repairing patent defects therein existing at the time of such acceptance. Thus in Delambre v. Williams, 36 La.Ann. 330, an owner was denied recovery of the cost of repairing sugar house machinery, which he used in the harvesting of his crop, after having accepted same, expressed satisfaction therewith and settled in full for the price thereof before complaining of defects therein. A similar result was reached in Mitchell v. Curell, 11 La. 252, wherein a building was accepted without objection until demand was made by the contractor for final payment. In A. M. Blodgett Construction Co. v. Cheney Lumber Co., 129 La. 1057, 57 So. 369, the issue concerned acceptance of a dam, the contract therefor being silent on the question of whether it was to be constructed straight or at an angle. It appeared that building of the dam at an angle would have been preferable but the owner without complaint accepted it built straight and was denied recovery for its subsequent failure.
The foregoing rule does not apply to defects which the owner of the work could not have discovered with reasonable care or which did not become manifest until after acceptance. Svendson v. American Indemnity Company, La.App., 76 So.2d 737; Seminary v. Blair, La.App., 52 So. 2d 877.
The cases relied upon by counsel for plaintiff, namely, Dyer v. Seals, supra, Clark v. Kemper, supra, Delambre v. Williams, supra, Mitchell v. Curell, supra, and Blodgett Construction Co. v. Cheney Lumber Co., supra, are readily distinguishable from the case at bar.
We believe, as did the learned trial judge, that the case at hand is controlled by that line of jurisprudence established by Costanza v. Cannata, 214 La. 29, 36 So. 2d 627, and Michel v. Efferson, 223 La. 136, 65 So.2d 115, which authorities clearly hold that to operate as a waiver of the right to claim damages for defective construction the owner must have intended such result and the burden is placed upon the contractor to show the owner had knowledge of the full extent of the damages and intentionally waived his rights. The Michel and Costanza cases, supra, are also authority for the principle that where an acceptance is granted with the understanding that items complained of will be corrected and completed, such acceptance does not constitute a waiver. In the latter case the court felt the action of the contractor in attempting to remedy some of the defects after acceptance was filed, indicated not only that the acceptance was not intended by the owner as a waiver but that such was also known and understood by the contractor.
The facts in the instant case closely parallel those in the Costanza case, supra. It is clear from the evidence adduced on the trial of the case at bar that defendant had no intention of waiving his rights in the *66 premises as evidenced by the numerous letters addressed to plaintiff (both prior and subsequent to formal acceptance) and that same was also known and understood by plaintiff who following acceptance of the work made several attempts to remedy the flaws which have given rise to this litigation.
Plaintiff's contention that defendant is estopped because defendant contributed to some of the alleged defects and prohibited plaintiff from entering the premises is without foundation in the record. Basically, the contention is predicated upon defendant's alleged walking upon the roof so as to cause same to leak, removal of a tarpaulin placed over a chimney to protect same from the weather and causing the residence to be overheated in an effort to dry out plaster which had been subjected to wetting because of the leaking roof. We believe that no useful purpose would be served in detailing the voluminous testimony adduced on this score except to comment that the matter was one of fact which was adversely resolved against plaintiff by the trial court, in which ruling we find no manifest error. We hold, therefore, that plaintiff's exceptions of no right and no cause of action are without merit and were properly overruled by the trial court.
Plaintiff claims the right of recovery of premiums paid for builder's risk insurance and contractor's performance bond predicated on Articles 29 and 30, respectively, of the Standard Documents of the American Institute of Architects annexed to and made part of the contract. Article 29 thereof stipulates that builder's risk insurance shall be provided by the owner whereas Article 30 specifies the owner may require a performance bond, the cost of which shall be paid by the contractor if instructions to that effect are given prior to submission of bids. Considerable parol evidence was introduced by both plaintiff and defendant to establish their respective contentions with regard to liability for these items, said testimony being presented without objection upon the part of either that it may have enlarged the pleadings or may have violated the parol evidence rule. The matter, therefore, resolved itself into a purely factual issue which we will now proceed to consider.
Plaintiff concedes the original bid covering construction of the two proposed residences included the cost of such premiums but contends that after rejection of his original bid and in the course of negotiation with defendant for the construction of the single residence, plaintiff made it clear to defendant as well as defendant's architect Wilson that defendant would be responsible for premiums on the fire insurance and performance bond.
Wilson, the architect, in substance testified that he did not recall such conversation with plaintiff although he did not deny it may have transpired. His testimony, however, leaves a clear impression he believed the understanding between the parties was to the effect plaintiff would defray the cost of said premiums. In contradiction of the testimony of plaintiff, defendant testified that upon rejection of the original bid for two homes, plaintiff negotiated with defendant in two telephone conversations as a result of which plaintiff agreed to build defendant's home for the cost of the original contract price for two homes less the sum therein allotted for construction of the home for defendant's son, which residence was decided to be handled separately. According to defendant, in these discussions (in one of which defendant called plaintiff from a hotel in Ashville, North Carolina), defendant made it abundantly clear the insurance and bond would be required at plaintiff's expense. Defendant's testimony in this regard is corroborated by that of his wife who stated she was present and listening to her husband's conversation with plaintiff on both occasions and in one of said instances she herself spoke with plaintiff. From the foregoing, we conclude that the learned trial court properly found and held that the *67 contract price arrived at between plaintiff and defendant as hereinabove indicated included the premium on the insurance and bonds and to permit plaintiff recovery thereof would be to impose dual liability therefor upon defendant herein.
Considering next the action of the trial court in allowing defendant a credit in the sum of $250.93 to correct certain imperfections in the exterior South and East walls of the residence in question, we note the testimony reflects this particular item has been one of the chief sources of controversy between the parties to this litigation. It appears (see correspondence offered in evidence P-35, P-42, D-4, D-9, D-23, D-30, D-31, as well as photographs D-11 through D-14, inclusive) the brick veneer constituting the exterior wall fractured in a horizontal plane near the southeast corner of the building, the crack extending on both the South and East sides of the residence. Said defect occurred within approximately two months after defendant's acceptance of the home and progressed to the point that by actual measurement the fracture on the South wall was 31 feet in length and that on the East wall extended a distance of 21 feet 6 inches. Whereas, plaintiff admits the existence of said defects and his efforts to correct same, he vigorously contends they were not due to inferior workmanship and asserts they were caused either by improper design or by matters over which plaintiff had no control. Concerning these cracks, and defendant's allegation the walls in question cracked because the bricks forming same were not laid straight or true but were out of plumb causing a bulge in the wall near the base thereof, plaintiff testified that the walls were in fact as straight, true and plumb as it is humanly possible to erect them. The testimony of defendant's witnesses, however, consisting of that of defendant himself and two architects is to the effect that, by actual measurement, the walls are out of line as much as three-eighths to five-eighths of an inch. More specifically, Architect Wilson (who on two occasions removed bricks from the wall to examine it more closely) testified the fracture was near the water-proofing line at or near the top of the slab upon which the residence was constructed. His examination also revealed that whereas the upper portion of these walls are in proper alignment, the lower portion thereof has bulged or moved out. Conceding this condition may have resulted from an error in design, he also testified that he employed similar design on other projects without bulging having occurred. Contrary to plaintiff's assertion the wall may have bulged because certain bricks were removed therefrom at defendant's insistence they were not of the proper shade or texture, Wilson felt such action had nothing whatsoever to do with the resulting fractures that developed.
Perry Brown, an architect, testifying on behalf of defendant, stated he examined the wall and found a displacement thereof. After initially testifying about this matter, Brown reexamined the wall on which occasion he removed some bricks as well as a portion of the sheeting so as to expose the studding plate on top of the slab which disclosed that an expansion space or void of approximately ¾ inch left between the brick veneer and the floor slab rendered it improbable that the fracture could have resulted from slab expansion. According to Brown, if the fracture is not repaired water will seep through and enter between the wall. Defendant caused the wall to be examined by one Ernest G. Crabbe, a former contractor, who testified that the condition mentioned was very unsatisfactory and should be remedied. There is also in the record some testimony to the effect that newly completed brick work may have been left exposed to inclement weather and become wet from rain prior to the time the mortar had an opportunity to set or harden thereby weakening the mortar and causing the walls to sag. Plaintiff's attempt to show that the cracks in the wall (as well as fracture in the plaster which are hereinafter discussed) were caused by dynamiting in the area did not greatly impress the *68 trial judge and we are of the opinion the trial judge correctly concluded the damage to the brick work and plaster did not occur from this source.
The testimony shows that the cost of repairing the fracture in the exterior walls will amount to the sum of $250.93 and defendant was given credit against the retained percentage due plaintiff for said amount. In view of the evidence appearing in the record, we believe this award to be correct.
Long prior to defendant's acceptance of the completed project difficulty arose between the plaintiff and defendant concerning the condition of the plaster which formed the major portion of the interior finish. The chief area of difficulty was in the vicinity of the fireplace and chimney at which point it is conceded the worst condition developed. It is not disputed that the roof leaked in the vicinity of the chimney but the responsibility for said condition is a highly controversial issue between the parties. Defendant contends the roof leaked because the chimney flashing was improperly applied which matter was called to plaintiff's attention on numerous occasions. On the other hand, plaintiff contends the roof leaked not because the flashing was improperly applied but because on several occasions defendant and certain other parties walked upon the roof with their shoes on thereby damaging the roof and causing the leaks. Plaintiff further contends that on one occasion when the chimney was protected with a tarpaulin, defendant removed same and left the chimney exposed over a weekend during which time it rained and caused water to enter the home and damage the plaster. In addition, plaintiff contends part of the difficulty resulted from defendant's lighting the central heating system and keeping the house unduly warm in an effort to dry out the plaster after same had been wet due to the condition of the roof brought about by defendant. In addition, plaintiff maintains that for a period of approximately two months the house was left without the protection of a full roof when defendant halted the application of the roof because of defendant's indecision in selecting the color thereof. Defendant, of course, denied having done anything which in any way damaged the roof or caused it to leak and on the contrary testified that after repeatedly warning plaintiff about the flashing and on at least one occasion having taken plaintiff into the attic to demonstrate to plaintiff the point at which the roof was leaking, defendant became exasperated and engaged a workman to reflash the chimney after which the leak ceased. Furthermore, defendant denied that the house was left partially roofed due to defendant's inability to decide the color thereof but that rather defendant halted further application of the roof when it was discovered that the edges of the shingles curled or lifted up excessively leading defendant to believe the roof would either leak or be vulnerable to wind damage. In this connection defendant's testimony is corroborated to some extent by the representative of the manufacturer of the roofing initially applied who testified that the roof in fact did curl to some extent and that in order to satisfy defendant, the original roofing was removed at the manufacturer's expense.
Plaintiff's contention the cracks in the plaster were hairline cracks normally to be expected on a plaster finish due to excess humidity in this area is not substantiated in the record. The evidence in the form of testimony of several witnesses as well as certain photographs and more particularly Exhibits D-16, D-18, D-19 and D-22 show the cracks are considerably more than hairline cracks and are of such degree and extent as to be unacceptable to anyone. Several rooms in the house were thusly affected. The evidence shows that the cost of replastering the walls involved will entail an expenditure of $571.26 which amount the trial court allotted defendant herein and which award under the circumstances does not appear manifestly erroneous.
Learned counsel for plaintiff vigorously complains of the credit allowed defendant in *69 the amount of $573.16 being the estimated cost of repairing the broken porch tile. Counsel correctly points out that, in Article 17 of defendant's answer and reconventional demand, defendant has itemized 12 alleged defects, the repair of which defendant asserts will aggregate an amount in excess of $200. Counsel for plaintiff also points out that repair of the broken porch tile is not one of the items listed therein from which counsel argues the action of the trial court in permitting evidence relative thereto, over counsel's objection, constituted error and allowed defendant to enlarge his reconventional demand notwithstanding timely objection on the part of counsel for plaintiff.
The position of learned counsel for plaintiff on this issue would indeed be well taken except for the fact the record does not substantiate his claim of timely objection to the evidence he now asserts was inadmissible under the averments of defendant's reconventional demand. We have carefully read and reread each portion of the record alluded to by counsel in support of his argument and find learned counsel is in error in this regard. For example, counsel maintains such objection was entered at pages 52-59 of the transcript of testimony (118-125 of the record) but our perusal thereof reveals that counsel therein objected to certain evidence of an attempted compromise of the matter, said objection appearing on page 53 of the transcript. A similar objection appears on pages 54 and 55 of the transcript (120-121 of the record) based solely on the ground the evidence tendered sought to prove an offer of compromise. On page 56 of the transcript (122 of the record) counsel for plaintiff objected to certain evidence as violative of the parol evidence rule and not because it constituted an alleged enlargement of the pleadings. Again we note the objection of counsel appearing on page 64 of the transcript (130 of the record) based not on an alleged enlargement of the pleadings but on the ground the defendant having accepted the contract could not reconvene for the cost of correcting a patent defect. This same basis is made the foundation of counsel's objection entered on page 65 of the transcript (131 of the record). We further note that on page 66 of the transcript (132 of the record) the objection of counsel makes all the hereinabove mentioned objections general.
The testimony of Everett C. Woolie, a tile setter, commencing at page 94 of the transcript (160 of the record) shows the tile floor is indeed cracked around the outer edge of the porch. Although Woolie did not make a minute examination of the sub-floor, his testimony leaves no doubt that the tile was cracked and should be repaired; in addition, he estimated the cost of removing and replacing the broken tile without replacing the sub-floor. The record shows beyond question, Woolie's testimony was entered without objection on the part of the counsel for plaintiff that same constituted an enlargement of the pleadings.
Following the testimony given by Woolie, Architect Wilson testified regarding the condition of the porch floor; his testimony on this subject matter commencing on page 123 of the transcript (189 of the record). Wilson was questioned at length about the condition of the floor without objection by counsel for plaintiff that such testimony was dehors the pleadings. Wilson stated he saw the fractured tile for the first time when he reexamined the house preparatory to testifying on the trial of the cause. He described the crack as being situated on the outer extremity of the porch approximately 6 inches from the edge thereof just inside the screen and columns supporting the roof. According to Wilson, the fracture extended along a very definite line running through the middle of the tile and being approximately 7 to 8 feet in length. He further stated that according to the construction plans, the location of the fracture would be the last place at which he would expect such a defect to develop considering the plans and specifications called for the concrete sub-floor to overlap and rest upon the outer wall to receive support therefrom. *70 Although Wilson made no minute examination, he testified that apparently the sub-floor did not extend over the outside wall and was, therefore, not supported thereby causing the slab to settle and resulting in the defect described.
Perry L. Brown, an architect, testified relative to the porch floor commencing on page 260 of the transcript (326 of the record). He stated that he had examined the floor on two occasions, the first time being in November, 1954, and the second time before resumption of the trial in March, 1955, during which interval the fracture line increased in length. In an effort to determine the cause of the failure, he excavated around the outside wall of the porch to the footing, removed one of the tiles along the edge of the porch, and discovered that a concrete block had been placed on top of the foundation, brick had been placed on top of the block and then covered with tile and that the slab or concrete sub-floor did not extend over the exterior wall to obtain support therefrom. He concluded, therefore, that the slab was a "floating slab" which came up to the inside of the exterior wall but did not rest thereon. Upon completing his testimony one afternoon, Brown again reexamined the porch the following morning before resuming the stand and stated that upon this latter examination he removed some of the tile and found the fracture line directly over the joint between the outside brick foundation wall and the edge of the slab, which confirmed his original opinion the slab did not rest upon the outside wall.
During the course of the testimony given by Brown, plaintiff's objection to the introduction of testimony regarding the defective porch tile on the ground that such evidence enlarged the pleadings was entered for the first time on page 311 of the transcript (377 of the record).
Under such circumstances, we conclude as did the learned trial court, the objection of plaintiff came too late and the admission of further evidence relative thereto was not prejudicial to plaintiff's cause. At the time counsel for plaintiff objected to such evidence, the harm had already been accomplished considering that there were pages of testimony on this issue entered without objection on the part of counsel for plaintiff. The objections appearing on pages 47 and 48 of the transcript (113-114 of the record) were not related to the condition of the porch as contended by counsel for plaintiff but to alleged defective caulking. Moreover, the record reveals that upon being reminded that defective caulking was one of the 12 items listed in Paragraph 17 of defendant's answer and reconventional demand, counsel for plaintiff withdrew the objection.
Plaintiff testified that the slab of the porch floor was not a floating slab as contended by Wilson and Brown but was resting on the inner half of the concrete block and therefore overlapped said block by 4 inches, the outside half or four inches of the block having been utilized to accommodate a brick facing.
From the foregoing testimony the learned trial court concluded that the slab was indeed a floating slab as contended by defendant and did not overlap and rest upon the exterior wall and, therefore, lacked the support thereof and settled causing the condition of which defendant now complains. The trial court allowed the sum of $573.16, the estimated cost of removing and replacing the floor in proper fashion and in so doing, we cannot find that he committed manifest error.
The record contains considerable testimony regarding extras claimed by plaintiff for the performance of work beyond the provisions of the contract and specifications, some of which are disputed by defendant. Plaintiff claimed total extras in the aggregate amount of $1,488.16, less certain allowances and credits in the sum of $809.36 due defendant, leaving a balance in favor of plaintiff in the amount of $678.80. The record reflects defendant has paid plaintiff said difference of $678.80 due for extras. *71 Upon the trial defendant attempted to prove entitlement to further credits on said item. The trial court rejected defendant's claim in this regard on the ground of insufficient proof and in such conclusion we detect no error.
Plaintiff's contention that the amount of $678.80 representing the cost of extra work increased the contract price from $25,293.39 to $25,972.19 and, therefore, the 10% retained percentage due by defendant should be increased from $2,529.33 to $2,597.21 is clearly without merit as it obviously overlooks the fact that the entire amount due for extras has been paid in full and no portion thereof withheld or retained by defendant.
The final issue to be resolved herein is the award of $500 granted defendant by the trial court for inconvenience, mental suffering and discomfiture experienced by defendant during the repair of the various defects predicated on Paragraph 3, Article 1934, LSA-R.C.C., which reads as follows:
"Article 1934. 3. Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party. Where the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality or taste, or some convenience or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; a contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts, are objects and examples of this rule.
"In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none, but are bound to give such damages under the above rules as will fully indemnify the creditor, whenever the contract has been broken by the fault, negligence, fraud or bad faith of the debtor."
Plaintiff's complaint of error with respect to this award is based solely and exclusively on the theory that recovery of damages for inconvenience occasioned by violation of a contractual obligation is not compensable under our laws and as authority for said principle has cited Lillis v. Anderson, La.App., 21 So.2d 389, decided in 1945 by the Orleans Court of Appeal (presently the Fourth Circuit).
We have read the Lillis case, supra, and it does indeed hold as learned counsel for plaintiff suggests. However, astute counsel for defendant has directed our attention to Melson v. Woodruff, La.App., 23 So.2d 364, wherein this court (subsequent to the Lillis decision) held the contrary thereof and awarded damages in the sum of $500 for inconvenience and discomfort experienced by plaintiff therein as a result of defendant's default on a contract to sell plaintiff the residence in which defendant was residing necessitating plaintiff's purchase of a temporary abode. Moreover, we note an apparent departure from the ruling of the Lillis case, supra, by our brothers of the Fourth Circuit in later case of Meyer v. Succession of McClellan, La.App., 30 So. 2d 788, in which recovery of damages was permitted (under the provisions of Paragraph 3, Article 1934, LSA-R.C.C.) for inconvenience occasioned by a tenant's failure to vacate an apartment after proper notice. It would appear, therefore, that the latest expression of our brothers of the Fourth Circuit coincides with our own views. If, however, our conclusions in this regard are erroneous, the disparity between the views on the subject matter as expressed by this court and the Court of Appeal, Fourth Circuit, is a matter which addresses itself to the supervisory powers and jurisdiction of the Supreme Court.
*72 Adhering to the principles enunciated by us in the Melson case, supra, we believe that a contract for the construction of a home of the type involved in the case at bar has as its object the convenience of the owner within the meaning and intendment of the phrase "or some convenience" as used in Paragraph 3, Article 1934, LSA-R.C.C. entitling the owner of a residence to damages for inconvenience resulting from a contractor's breach of the obligation to construct same in a workmanlike manner according to the terms of the contract plans and specifications therefor.
It is clear plaintiff herein was aware defendant desired the residence which is the subject matter of this controversy for occupancy as a home for defendant and his familynot as an investment or for pecuniary gain or profit. It is equally certain defendant planned the home in question to suit his individual needs and tastes and accommodate the mode of living to which defendant was accustomed and for the express purpose of fulfilling defendant's individual conception of a home.
The evidence shows defendant was considerably distraught over the conditions which developed and that he devoted many hours of his spare time to correction of imperfections in the work. That defendant was upset and gravely concerned over the turn of events is amply demonstrated in the record. It further appears that to accomplish the necessary replastering and repainting each of five rooms must be completely vacated (either simultaneously or successively). In either event considerable moving of furniture will be involved. The general inconvenience and annoyance resulting from such a situation is obvious. The leaks in the roof caused defendant considerable anxiety over the effect thereof on the plastered walls and the presence of numerous workmen in the house, after its occupancy, for the purpose of inspection and repair resulted in many interruptions and disturbances of defendant's routine.
We readily concede that an award of damages based upon inconvenience is somewhat speculative in nature considering the obvious difficulty of assessing inconvenience, mental suffering and discomfort in terms of monetary value. In assessing damages of this nature, the courts possess broad discretion but must take special care to avoid the imposition of excessive damages and must bear in mind that punitive damages are not recoverable under our law. The award of $500 for the inconvenience suffered by defendant herein appears neither excessive nor inadequate and will therefore not be disturbed.
Judgment affirmed.